802 F.2d 314
 Fed. Sec. L. Rep. P 92,937
Lawrence R. BOLD, Appellant,
v.
David L. SIMPSON, II, Sharon Simpson and Senergy Petroleum
Corporation, Appellees.
Lawrence R. BOLD, Appellee,
v.
David L. SIMPSON, II and Senergy Petroleum Corporation, Appellants,
Sharon Simpson.
Lawrence R. BOLD, Appellant,
v.
David L. SIMPSON, II, Sharon Simpson and Senergy Petroleum
Corporation, Appellees.
 Nos. 85-1113, 85-1123 and 85-1151.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1986.
Decided Oct. 1, 1986.
Rehearings Denied Nov. 7, 1986.
 
 Donald F. Martin and Thomas C. Brown, Kansas City, Mo., for Bold.
 Roy Bash, Kansas City, Mo., for Simpson.
 Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and ROSS, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Lawrence R. Bold brought suit in federal district court against David L. Simpson, Sharon Simpson[1] and the Senergy Petroleum Corporation (Senergy) in connection with Bold's investment in a failed oil and gas venture, the Reed Ranch lease. In his complaint, Bold alleged, inter alia, that Simpson fraudulently induced him to invest in the Reed Ranch venture, negligently managed the investment, and converted Simpson's interests in the Reed Ranch venture. Simpson counterclaimed, alleging that Bold committed legal malpractice through his representation of Simpson in the structuring of the Reed Ranch investment, and Senergy alleged that Bold breached his fiduciary duty as a director of Senergy. After a five-day trial, the jury awarded Bold $5,000 actual damages on the fraud claim, $12,500 actual damages on the negligent management claim, $19,000 actual damages on the conversion claim and $100,000 punitive damages on the conversion claim against both defendants. In addition, the jury awarded Simpson $325,000 actual damages on its counterclaim for legal malpractice, and it awarded Senergy $5,000 actual damages on Senergy's counterclaim for director liability. The district court then entered judgment upon the jury verdicts and ruled on various motions. Both Bold and defendants appeal. For the reasons discussed below, we affirm in part, reverse in part, and remand.
 
 I. BACKGROUND
 
 2
 Lawrence R. Bold is an attorney with the Kansas City law firm of Morris, Larson, King, Stamper & Bold. He practices primarily in the areas of tax, corporate, and real estate law. Bold and David L. Simpson first became acquainted in the early 1970's. Prior to the instant litigation, Bold and Simpson were good friends who associated with each other both socially and professionally. Bold served as Simpson's attorney on a variety of matters. Both men had experience in various business investments, including oil and gas ventures.
 
 
 3
 In August 1977, Simpson approached Bold about participating in an oil and gas lease prospect, the Reed Ranch lease, which Simpson had located in Chautaqua County, Kansas. Simpson asked Bold to undertake the legal work to form a corporation to handle oil investments, specifically to acquire the Reed Ranch lease. Bold performed the necessary work to incorporate the Senergy Petroleum Corporation, and he also became the secretary and a director of that corporation. Furthermore, Bold provided Simpson with a copy of a prospectus from a previous oil and gas venture in which Bold had invested. Simpson used this prospectus to prepare materials for investors in the Reed Ranch lease.
 
 
 4
 A major issue of dispute in this case is whether Bold assumed any legal responsibilities beyond incorporating Senergy; that is, whether Bold represented Simpson on the securities issues present in the Reed Ranch venture. Bold testified that he agreed to incorporate Senergy, yet advised Simpson to contact an attorney in Wichita, Kansas, to consider any possible securities issues. He said that he told Simpson that he had no background nor experience in securities law and therefore could not represent him in this area. To the contrary, Simpson testified that Bold did not advise him to seek separate securities counsel. Furthermore, he testified that Bold reviewed the text of the investment documents that Simpson had prepared before they were distributed to other investors. Simpson said that Bold never advised him that the interests in the Reed Ranch lease were securities that must be registered in Missouri. Simpson said that it was his understanding that Bold was representing him in all aspects of the structuring of the Reed Ranch venture.
 
 
 5
 After the formation of the Senergy Petroleum Corporation, Simpson executed an agreement between it and George Ewonus for the acquisition of the Reed Ranch lease. The agreement stated that Senergy was to pay $150,000 for the lease and that Ewonus would be responsible for operating it. Ronald Joe and Brenda Reed owned the land that was being leased, and they also retained a landowners' royalty payment.
 
 
 6
 Simpson then put together a group of eleven people, including himself and Bold, to invest in the Reed Ranch lease.[2] Bold's investment amounted to $12,500. In December 1977, Simpson located another lease prospect in Chautaqua County, Reed Ranch A. This second lease was on property owned by the same individuals just south of the original Reed Ranch lease property. Many of the investors in the original Reed Ranch lease also invested in Reed Ranch A. Bold, however, did not participate in this second venture.
 
 
 7
 Unfortunately, both the Reed Ranch and the Reed Ranch A investments were unsuccessful. Early in 1978, the Reed Ranch lease returned a net distribution of approximately $3500 to the investors, yet from that time on expenses exceeded profits. In fact, by July 15, 1978, the Reed Ranch venture was apparently $8,677 in the red as the cost of operating had exceeded the income produced. At this time, Simpson attempted to convince the investors to contribute some additional funds, yet they decided against it.
 
 
 8
 The investors became increasingly dissatisfied with the lack of profit and, on December 21, 1978, a meeting was convened to attempt to ascertain the problems and develop a plan. Apparently this meeting proved unsuccessful because in early 1979, a group of Reed Ranch and Reed Ranch A investors, not including Bold, filed suit against Simpson (Spitcaufsky litigation[3] ). The Spitcaufsky litigation plaintiffs alleged various claims against Simpson, including negligent management of the lease, false representations, and non-compliance with federal and state securities laws. These claims were litigated through the discovery stage for almost two years before a settlement agreement was reached on November 26, 1980. Simpson testified that his liability under that agreement was approximately $225,000. In addition, he estimated that the time and effort he had to spend defending the Spitcaufsky litigation cost him $100,000 in lost business opportunities.
 
 
 9
 As noted above, Bold did not participate in the Spitcaufsky litigation. Bold filed suit against Simpson in federal district court on November 30, 1981, alleging ten separate claims in his complaint. Simpson and Senergy counterclaimed against Bold for legal malpractice and corporate director liability. Simpson alleged damages on these claims in the amount of the Spitcaufsky settlement. He argued that the primary claim in the Spitcaufsky litigation concerned non-registration of securities, and he contended that Bold failed to advise him of the need to register.
 
 
 10
 Bold's claims against Simpson were essentially that Simpson fraudulently induced him to invest in the Reed Ranch venture, negligently managed the venture, and converted Simpson's interest in the investment. As discussed above, the Reed Ranch venture essentially never made a profit. Because of this, the operator of the lease, George Ewonus, was apparently not being paid consistently, and eventually he walked off the lease and refused to operate it any longer. This apparently happened some time in the early part of 1979. At this point, perhaps March 1979, production on the Reed Ranch lease stopped. In the fall of 1979, the landowner, Ronald Joe Reed, instituted proceedings to take back the lease for non-production. It was at this time that Simpson took a reassignment of the lease, but now in his own name instead of in Senergy's name.
 
 
 11
 At trial, Bold argued that Simpson's management of the lease during this period was negligent. Furthermore, he asserted that Simpson stopped informing him of events transpiring with the lease once the Spitcaufsky litigation began. The basis to Bold's conversion claim arises out of the reassignment of the lease. There was conflicting testimony on this point at trial. Simpson stated that Mr. Reed required Simpson to take the lease in his (Simpson's) own name and Simpson did so as to retain the lease. Furthermore, Simpson argued that despite taking the lease in his own name, he maintained accounts for the investors. Bold, among other things, pointed to Simpson's utilization of depreciation of the equipment on Simpson's tax returns as evidence that Simpson exercised ownership over the lease and the equipment.
 
 
 12
 The district court submitted to the jury Bold's fraud, negligent management, and conversion claims, as well as Simpson's and Senergy's respective counterclaims of legal malpractice and corporate director liability. The district court, however, declined to instruct the jury on Bold's claim under Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. Sec. 240.10b-5 (1986), but granted Simpson's motion to dismiss on the 10b-5 claim. In its verdict, as we have noted, the jury awarded Bold $5,000 actual damages on the fraud claim, $12,500 actual damages on the negligent management claim, $19,000 actual damages on the conversion claim, and $100,000 punitive damages on the conversion claim. In addition, the jury awarded Simpson $325,000 actual damages on its counterclaim for legal malpractice, and it awarded Senergy $5,000 actual damages on Senergy's counterclaim for director liability. With this brief background, we turn to the appeals made by the parties.[4]II. DISCUSSION
 
 A. Bold's Appeal
 
 13
 1. Jury Instruction on Legal Malpractice and Corporate Director Liability
 
 
 14
 We consider first Bold's contention that the district court erred by giving jury instruction no. 23 on legal malpractice. Bold argues that this instruction failed to submit to the jury the disputed factual issue of whether Bold served as Simpson's lawyer on the securities issues in the Reed Ranch investment. We agree with Bold's contention.
 
 
 15
 In assessing the adequacy of jury instructions, we must determine if the instructions taken as a whole, and viewed in light of the evidence, fairly and adequately submit the issues in the case to the jury. Circle J Dairy v. A.O. Smith Harvestore Products, 790 F.2d 694, 698 (8th Cir.1986); Federal Enterprises v. Greyhound Leasing & Financial Corp., 786 F.2d 817, 820 (8th Cir.1986); see Beck v. Modern American Life Insurance Co., 589 S.W.2d 98, 103 (Mo.Ct.App.1979). Furthermore, we must keep in mind that a party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support it. Gandor v. Mr. Steak of Sun Ray, Inc., 774 F.2d 920, 924 (8th Cir.1985); see Welch v. Sheley, 443 S.W.2d 110, 118 (Mo.1969).
 
 
 16
 Applying these principles to the present case, we conclude that instruction no. 23, viewed in light of the charge to the jury as a whole, failed to inform the jury adequately of the essential issues raised by the evidence at trial. Instruction no. 23 read as follows:
 
 
 17
 Your verdict must be for defendant David L. Simpson on his counterclaim if you believe:
 
 
 18
 First, plaintiff was representing defendant, as his attorney, in the structuring of the oil and gas venture known as Reed Ranch; and
 
 
 19
 Second, plaintiff failed to advise defendant of the need to register, in the State of Missouri, the securities offered for sale in connection with the Reed Ranch ventures; and
 
 
 20
 Third, plaintiff was thereby negligent; and,
 
 
 21
 Fourth, as a direct result of such negligence, defendant sustained damage.
 
 
 22
 The term "negligent" or "negligence" as used in this Instruction means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of plaintiff's profession.
 
 
 23
 Instruction no. 23.
 
 
 24
 In objecting to this instruction, Bold's counsel stated in part to the trial judge:
 
 
 25
 I believe that that instruction is error and does not state what the factual controversy is about in this lawsuit, and for that reason I have submitted Instruction No. H, which the Court has referred to and indicated that the Court will refuse to give.
 
 
 26
 I object to Instruction No. 23, the legal malpractice verdict director, because if we look at paragraph first in that verdict director, it speaks about instructing of the oil and gas venture. I respectfully submit that structuring is not what the factual question or controversy is about in this case. In fact, there is no evidence that in structuring there was a duty to advise about registration, and there is no evidence that structuring raised that duty.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Under this instruction, Instruction No. 23, the jury can believe Mr. Bold and still find against him. That is why my tendered instruction H, Your Honor, goes on beyond structuring and says with respect to whether or not the ownership interests in that venture were securities and whether they were required to be registered.
 
 
 30
 I think Instruction No. 23 is prejudicial because it really doesn't define the jury or restrict the jury to what that lawsuit is really about; it's too general.
 
 
 31
 In the case, the parties disputed whether Bold undertook to advise Simpson on the securities question involved in the Reed Ranch oil investment. Bold testified that during a discussion on August 31, 1977, he specifically told Simpson that while he would draw up the incorporation papers and represent the corporation, he--Bold--had no securities background or experience and could not represent him in his interests in oil and gas securities work. Bold further testified that he advised Simpson to go to Wichita, Kansas, to find a lawyer who specialized in oil and gas securities.
 
 
 32
 Simpson, in his testimony, presented a very different version of that same conversation. In giving him guidance on drafting the investment documents, Simpson claimed that Bold essentially counselled him on securities matters relating to Reed Ranch. At the same time, Simpson testified that Bold never advised him that the investment documents were securities that must be registered in Missouri or that he should consult a lawyer specializing in oil and gas securities. Simpson related that after he saw a Wichita lawyer in December of 1977 who told him registration of the interests was necessary, Bold advised him not to, stating "you are dealing with friends, close your eyes and go ahead. Sometimes you just have to do that."
 
 
 33
 Thus, instruction no. 23, quoted above, did not reach the question in controversy: whether Bold undertook, in his capacity as Simpson's lawyer, to advise Simpson as to whether or not oil and gas ownership interests constituted securities or needed to be registered. Bold not only objected to instruction no. 23 but tendered instruction H, reproduced below, which could have alleviated the alleged error in the instruction. Proposed instruction H reads in pertinent part:
 
 
 34
 Your verdict must be for defendants on their counterclaim if you believe:
 
 
 35
 First, plaintiff was representing defendants, as their attorney, in the structuring of the oil and gas venture known as Reed Ranch with respect to whether or not the ownership interests in that venture were securities, and whether they were required to be registered * * *.
 
 
 36
 Instruction no. H. [The balance of the instruction was identical to instruction no. 23 except for the final paragraph.]
 
 
 37
 The court refused the tendered instruction, and, as we have noted, read instruction no. 23 to the jury. Further, in its post-trial ruling on Bold's motion for a new trial, the district court adhered to its previous ruling concerning instruction no. 23 and proposed instruction H.
 
 
 38
 Instruction no. 23 permitted the jury to find Bold liable for legal malpractice without having to specifically determine that Bold represented Simpson on the securities aspects of the Reed Ranch venture. Instruction no. 23 merely required the jury to find that "[Bold] was representing [Simpson] in the structuring of the oil and gas venture." Thus they did not permit the jury to address the factual dispute of whether or not plaintiff Bold represented Simpson in the sale of ownership interests and in advising or failing to advise Simpson as to the need to register these interests as securities. Due to this fundamental error in instructing the jury in the malpractice issue, we reverse the judgment of the district court and remand the case for a new trial on the question of legal malpractice.
 
 
 39
 Bold also contends that the district court erred in submitting instruction no. 28 regarding corporate director liability. That instruction reads as follows:
 
 
 40
 Your verdict must be for defendant Senergy Petroleum Corporation on its counterclaim if you believe:
 
 
 41
 First, plaintiff Bold was a director of a Senergy Petroleum Corporation; and,
 
 
 42
 Second, as a director, plaintiff Bold failed to fulfill his fiduciary duty to Senergy Petroleum Corporation by failing to advise it of the need to register, in the State of Missouri, the securities offered for sale in connection with the Reed Ranch ventures; and,
 
 
 43
 Third, plaintiff was thereby negligent; and,
 
 
 44
 Fourth, Senergy Petroleum Corporation was damaged as a direct result of plaintiff Bold's negligent failure to fulfill his fiduciary duty.
 
 
 45
 The term "negligent" and "negligence" as used in this Instruction means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances.
 
 
 46
 Instruction no. 28. Bold argues that this instruction is fatally defective because it presupposes that a corporate director, who happens to be a lawyer, has the fiduciary duty to advise the corporation on legal matters.
 
 
 47
 We disagree. Although instruction no. 28 did not represent a model of clarity on the particular facts and circumstances of this case, it was not erroneous. Crimm v. Missouri Pacific Railroad, 750 F.2d 703, 711 (8th Cir.1984). We believe that this instruction merely told the jury to find against Bold if it determined that he failed to exercise the degree of care that an ordinarily prudent person would use under similar circumstances. Furthermore, we believe that sufficient evidence was presented for the jury to conclude that a person with Bold's knowledge, skill, and experience, serving in the role of a corporate director and exercising ordinary care, would have advised Senergy of the securities registration requirements. Therefore, we uphold the verdict against Bold for corporate director liability.
 
 2. Directed Verdict on Bold's 10b-5 Claim
 
 48
 Bold contends that the district court erred by granting Simpson's motion for a dismissal on Bold's 10b-5 claim. We disagree.[5]
 
 
 49
 In reviewing the decision of a district court upon a motion for a dismissal or a directed verdict, we use the same standard applied by that court in deciding the issue. That is, we must determine whether or not the evidence was sufficient to create a submissible case for the jury. Horn v. Ray E. Friedman & Co., 776 F.2d 777, 779 (8th Cir.1985). In the present case, we must consider the evidence in the light most favorable to Bold, assume as true all facts that Bold's evidence tended to prove, and give Bold the benefit of all favorable inferences. See Williams v. Ryder/P.I.E. Nationwide, Inc., 786 F.2d 854, 857 (8th Cir.1986); Crues v. KFC Corp., 729 F.2d 1145, 1148 (8th Cir.1984).
 
 
 50
 Applying this standard, we hold that the district court did not err by granting Simpson's motion for a directed verdict on Bold's 10b-5 claim. Based upon our review of the record and the briefs, we conclude that Bold did not make a submissible case on at least one of the elements of the cause of action under Rule 10b-5, the "in connection with a purchase or sale of any security" requirement. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Bold argues that Simpson's conversion of Bold's interests in the Reed Ranch lease constituted a sale or purchase of a security. This argument is akin to the "forced seller doctrine." See Vine v. Beneficial Finance Co., 374 F.2d 627, 634-35 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); L. Loss, Fundamentals of Securities Regulation 923-24 (1983). In light of the specific facts of this case, however, we do not believe that Bold's 10b-5 claim fits under the "forced seller doctrine." Instead, it merely represents a disguised restatement of Bold's conversion claim. Therefore, we hold that the district court did not err in dismissing the 10b-5 claim.
 
 3. Motion For Sanctions
 
 51
 Bold contends that the district court erred in denying his motion for sanctions against Simpson. Bold argues that sanctions should have been imposed against Simpson for his failure to produce certain documents in discovery. We will not overturn a ruling by the trial judge on a motion such as this in the absence of a clear abuse of discretion. See Fox v. Studebaker-Worthington, Inc., 516 F.2d 989, 993 (8th Cir.1975). We find no such abuse here.
 
 B. Simpson's Cross-Appeal
 1. Duplicative Damage Award
 
 52
 Simpson contends that the damages awarded Bold on his fraud, negligent management, and conversion claims are duplicative and excessive. We agree in part.
 
 
 53
 Although Bold is entitled to proceed on various theories of recovery, the theories must be pursued with caution. Bold cannot receive duplicative damages, instead he must establish a separate injury on each theory. Ross v. Holton, 640 S.W.2d 166, 172-73 (Mo.Ct.App.1982); Clayton Brokerage Co. of St. Louis v. Pilla, 632 S.W.2d 300 (Mo.Ct.App.1982). The jury awarded Bold $5,000 actual damages for fraud, $12,500 actual damages for negligent management, and $19,000 for conversion.
 
 
 54
 After reviewing the briefs and the entire record, and hearing oral argument, we conclude that Bold is entitled to but one award for conversion in the sum of $19,000. The other awards represent losses which have merged into the value of the property converted. See Holmberg v. Morrisette, 800 F.2d 205, 212 (8th Cir.1986). Therefore, we hold that the damages are limited to the award made by the jury in favor of Bold for conversion in the sum of $19,000. We conclude that Bold established only one injury on all three theories of recovery.
 
 
 55
 Simpson's claim that the district court erred in submitting Bold's conversion claim to the jury is without merit.
 
 2. Punitive Damages
 
 56
 Simpson contends that the district court erred in submitting the issue of punitive damages on Bold's claim of conversion to the jury. We agree. The record in this case fails to show any actual malice or legal malice on Simpson's part. Therefore, the district court erred in submitting the issue to the jury and the punitive damages award must be overturned. Moon v. Tower Grove Bank & Trust Co., 691 S.W.2d 399, 401 (Mo.Ct.App.1985); Oster v. Kribs Ford, Inc., 660 S.W.2d 348, 356 (Mo.Ct.App.1983); see Sanders v. Daniel International Corp., 682 S.W.2d 803, 807-08 (Mo.1984) (en banc).
 
 III. CONCLUSION
 
 57
 Accordingly, on Bold's appeal, we vacate the award for legal malpractice against Bold in the sum of $325,000 and remand that claim for a new trial. We sustain the award of $5,000 for director liability against Bold. We also sustain the dismissal of Bold's rule 10b-5 claim.
 
 
 58
 On the cross-appeal, we direct the district court to limit Bold's recovery to $19,000 awarded by the jury on the conversion claim and set aside the other awards against the defendants as merged in damages for the conversion. We also set aside Bold's award for punitive damages.
 
 
 59
 Each party shall be entitled to interest as determined by the district court. This case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 60
 The parties shall stand their own costs on these appeals.
 
 
 
 [1]
 The district court granted Sharon Simpson's motion for a directed verdict on all claims against her, and this ruling has not been appealed
 
 
 [2]
 The record indicates that the investors in Reed Ranch included David Simpson, Lawrence Bold, Lewis Nerman, Jerome Nerman, Dr. Allen Chandler, Mr. Saylors, Leo Hallak, Michael Russell, Larry Spitcaufsky, Melvin Spitcaufsky and Robert Mayer. Each person invested $12,500, with the exception of Mr. Saylors who invested $25,000
 
 
 [3]
 Larry Spitcaufsky, a Reed Ranch and Reed Ranch A investor, was apparently a lead plaintiff in this litigation. The parties used the term "Spitcaufsky litigation" in their briefs, and we will do likewise
 
 
 [4]
 This is a diversity case, and Missouri substantive law applies. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)
 
 
 [5]
 Although the district court denominated its action as a directed verdict on that issue, as we read the record, the district court's action appears to be a dismissal. The jury entered no verdict in fact at the direction of the trial judge. The precise reason behind the district court's entry of a "directed verdict" on Bold's 10b-5 claim is not clear. However, we may affirm a district court's judgment on any ground finding support in the record. See Schweiker v. Hogan, 457 U.S. 569, 585 n. 24, 102 S.Ct. 2597, 2607 n. 24, 73 L.Ed.2d 227 (1982); Moore v. Warwick Pub. School Dist. No. 29, 794 F.2d 322, 328 (8th Cir.1986)